## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **ROBERT GONZALEZ, ADDISON COUNTY, TX 75001,**<br><br>**PLAINTIFF,**<br><br>**V.**<br><br>**RAJESH PAVITHRAN (A/K/A KELVIN), 13528 DAVINCI LANE, HERNDON, VA 20171, AND**<br><br>**KELVIN BOON LLC, (D/B/A "BOON TECH") 13528 DAVINCI LANE, HERNDON, VA 20171,**<br><br>**DEFENDANTS.** | **CASE NO. 1:18-cv-341**<br><br><br>**TRIAL BY JURY DEMANDED** |

## VERIFIED COMPLAINT FOR
## DAMAGES AND INJUNCTIVE RELIEF

Plaintiff Robert Gonzalez states the following for his Complaint against Rajesh Pavithran (a/k/a "Kelvin") and Kelvin Boone LLC (the "Company" or "Boon Tech") (together, the "Defendants").

## <u>INTRODUCTION</u>

1.     This action arises out of Pavithran's and the Company's employment of Plaintiff to participate in an Initial Coin Offering ("ICO") the Defendants used to raise capital for a startup venture doing business as Boon Tech.[1] The Company is a platform for employers and

---

[1] An ICO is a relatively new form of securities offering by which funds are raised for a new venture by selling newly-created cryptocurrency, such as ethereum and the well-known bitcoin. Startup companies have used ICOs to bypass the rigorous and regulated capital-raising process

"freelancers" or independent contractors to do business with each other. The Company's cryptocurrency – the "Boondollar" – is the medium of exchange.

2.      In return for Plaintiff's promise to work on the ICO, Defendants promised to pay Plaintiff $700,000. The exchange of promises constitutes an agreement requiring the Company to pay Plaintiff $700,000 for his services. Because the contract could be – and indeed was – performed in less than one year, the Statute of Frauds does not apply.[2]

3.      Plaintiff fully performed the contract but Pavithran, who dominates and controls the Company, has refused to pay Plaintiff in breach of the agreement.

4.      Plaintiff is an Securities and Exchange Commission accredited investor. Plaintiff spent over 1,500 hours on the ICO and was materially responsible for its success in raising over $8 million. The market value of Plaintiff's services exceeds $750,000. **Indeed, Defendants so value Plaintiff's experience, expertise, and reputation that the Company's web site featured Plaintiff at Boon Tech's top level until March 2018, when Plaintiff formally threatened litigation unless Defendants cured their breach of contract.** Similarly, only after Plaintiff threatened to sue Defendants for non-payment did Pavithran remove Plaintiff

---

required by venture capitalists or banks and, at present, enforced by the Securities Exchange Commission. In an ICO campaign, a percentage of the cryptocurrency (in this case "Boondollars") is sold to early backers of the project in exchange for legal tender or other cryptocurrencies. Because ICOs have been relatively unregulated, they are particularly prone to manipulation by individuals such as Pavithran to raise startup capital despite conduct that would not withstand even the slightest scrutiny of government regulators, banks, fund managers, or sophisticated investors.

[2] Even were that not the case, Plaintiff can produce written evidence of the agreement to satisfy the statute.

from the White Paper. Prior to March, 2018, Plaintiff was identified in the White Paper, with his picture and career highlights, as a member of the Boon "Team."[3]

5.     Pavithran's misconduct and fraudulent intent is apparent not only from his failure to pay Plaintiff in accordance with his agreement, but is also evidenced by documents in which Pavithran admits owing Plaintiff for his work. Plaintiff seeks damages, statutory penalties, and attorneys' fees for fraud, breach of contract, promissory estoppel, breach of the implied covenant of good faith and fair dealing, and quantum meruit.

## PARTIES

6.     Plaintiff Robert Gonzalez is a citizen of Addison County, Texas.

7.     Defendant Rajesh Pavithran (a/k/a "Kelvin") is a citizen of the Commonwealth of Virginia residing at 13528 DaVinci Lane, Herndon, VA 20171.

8.     Defendant Kelvin Boon LLC, d/b/a "Boon Tech," is a limited liability company organized and existing pursuant to the laws of the Commonwealth of Virginia. Boon Tech's principal place of business is Pavithran's residence at 13528 DaVinci Lane, Herndon, VA 20171. Pavithran is Boon Tech's agent for service of process in the Commonwealth of Virginia.

## JURISDICTION AND VENUE

9.     This Honorable Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff and both Defendants are citizens of different states and the amount in controversy exceeds $75,000.

---

[3] Plaintiff had repeatedly demanded Pavithran remove his picture and resume from the web site so as not to mislead investors. Boon Tech still features Plaintiff's company as an affiliate. This is false and misleading.

10.     This Honorable Court has personal jurisdiction over Pavithran pursuant to Fed. R. Civ. P. 4(e) and Va. Code §§ 8.01-328.1(A)(3) because he resides in the Commonwealth of Virginia.

11.     This Honorable Court has personal jurisdiction over Boon Tech pursuant to Fed. R. Civ. P. 4(e) and Va. Code §§ 8.01-328.1(A)(3) because the Company exists pursuant to the law of, and has its principal place of business in, the Commonwealth of Virginia.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because both Defendants are located here and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions that comprise Plaintiff's claims occurred here.

## FACTUAL ALLEGATIONS

13.     Plaintiff is the founder of one of the first bitcoin exchange in Texas, UXTO, has eight years of experience in the cryptocurrency market, serves as a paid advisor to well-known, successful blockchain companies, and has an impeccable reputation in the blockchain and cryptocurrency communities. That reputation is based on honesty, integrity, and ability.

14.     Plaintiff routinely performs consulting work for blockchain and cryptocurrency companies at a rate of $500 per hour. [4]

15.     Pavithran sought out Plaintiff in order to retain his services and his reputation in order to lend credibility to an ICO in order to raise capital for his company, Boon Tech.

---

[4] Blockchain is the technology that underlies all cryptocurrency. It applies sophisticated algorithms to protect the validity, reliability, and identifiability of transactions in all cryptocurrencies. More to the point, blockchain technologies provides the "trust" that is necessary for any mode of exchange, including fiat currencies, to be successful.

16.    Boon Tech is a platform for independent contractors and freelance workers to interface with employers needing their services. Participating employers and contractors exchange work for Boon Tech's cryptocurrency, the "Boondollar." Boon Tech takes a commission on each project.

17.    Because ICOs have been until recently unregulated, they are particularly prone to manipulation by individuals such as Pavithran to raise startup capital despite conduct that would not withstand the scrutiny of federal or state regulators, banks, hedge fund managers, or sophisticated investors.

18.    In order to fund Boon Tech, Pavithran used an ICO in which he hoped to raise $7-10 million.

19.    As noted above, an ICO is a relatively new form of securities offering by which funds are raised for a new venture by selling a newly-created cryptocurrency. Examples of cryptocurrencies are ethereum and the well-known bitcoin. Startup companies can use an ICO to bypass the rigorous and highly regulated capital-raising process required by venture capitalists or banks and, until recently, enforced by the Securities Exchange Commission and state regulators. In an ICO campaign, a percentage of the cryptocurrency – in this case a new cryptocurrency called "Boondollars" – is sold to early backers of the project in exchange for legal tender or other cryptocurrencies.

20.    Upon information and belief, this is precisely why Pavithran chose to capitalize his company in this manner.

21.    For instance, written communications between Pavithran and Plaintiff evidence several instances of misconduct and questionable ethics on the Pavithran's part. In particular,

Pavithran uses Plaintiff's and his own contacts to recruit well-known, credible advisors whom he intends to hold out as key team members in order to generate income.

22.     However, Pavithran admits in writing these individuals will have no real role in the Company. Pavithran trades on their perceived expertise but has no intention of either incorporating them into the management of Boon Tech or – as is his wont – paying them as promised. Pavithran uses them as window dressing to deceive prospective investors. Plaintiff objects to this practice.

23.     Upon information and belief, Pavithran engaged in a series of shady practices:

    a.    Failing to do a securities analysis of the token's value in order to avoid having to comply with SEC and state law requiring disclosure of material facts and risks.

    b.    Intending to make payments in the tokens that he would be in a position to manipulate to his personal advantage.

    c.    Hiring "hot" female models to market the ICO.

    d.    Repeatedly lying to Plaintiff in response to Plaintiff's request for a written version of his agreement with Defendants.

    e.    Retaining advisors to lend credibility to Boon Tech but refusing to pay them at all or to pay them as promised.

    f.    Using a single member LLC that Pavithran created in 2013 to receive the funds generated by the ICO in order to maintain complete control over the money raised.

    g.    Attempting to enlist Plaintiff to assist Boon Tech's not paying vendors and advisors. Plaintiff refuses to be complicit in this misconduct.

24.     Upon information and belief, Pavithran has converted Boon Tech funds to his personal use.

25.     As time went on, Plaintiff became aware of Pavithran's dishonest behavior, lost confidence in him, and refused to be complicit in any of Pavithran's unethical acts or omissions. Indeed, by the winter of 2017, after having performed the agreement, Plaintiff demanded Pavithran remove him from the Company's web site. Pavithran refused to comply with Plaintiff's demand.

**Defendants Enter into a $700K Agreement with Plaintiff**

26.     Upon information and belief, Pavithran recognized that Plaintiff's contacts and reputation would increase the likelihood that he could raise a sufficient amount of money to fund his startup.

27.     In order to materially increase the likelihood of success for the Boon Tech ICO, Pavithran contacted Plaintiff in the summer of 2017 to discuss his proposed startup and plans to raise money through an ICO.

28.     After several days of back and forth discussion, in September 2017, Pavithran offered to pay Plaintiff $700,000 to work for Pavithran and Boon Tech. In return, Pavithran and Boon Tech obtained Plaintiff's agreement to perform several tasks. The principal task was Plaintiff's agreement to participate in drafting the Company's "White Paper."

29.     An ICO's White Paper is analogous to a traditional investment's business plan and prospectus and is intended to be the key marketing document to prospective investors in the company. The White Paper is the critical component of any ICO, and Pavithran's offer to pay Plaintiff to draft the White Paper for Boon Tech reflects Pavithran's recognition of Plaintiff's integral value to Boon Tech's success.

30.     Pavithran also employed Plaintiff to perform additional tasks, described in more detail below.

31.     Plaintiff accepted Defendants' offer. He promised to perform, and performed, each and every duty under the terms of the agreement. On September 6, 2017, Plaintiff prepared an outline for ICO steps and promised to "do everything possible for the [Boon Tech] project['s]" success.

32.     In September 2017, Pavithran asked for Plaintiff's curriculum vitae for use in Boon Tech marketing materials, identifying Plaintiff as a member of Boon Tech's "team," and for inclusion in the White Paper.

33.     Over the next four months, Plaintiff worked full time for Defendants. Among other things, he (a) drafted and revised substantial portion of the Boon Tech White Paper, (b) made introductions to colleagues with cryptocurrency and blockchain experience, (c) made introductions to colleagues associated with entities, such as IBM, GE, Merrill Lynch, and Oracle that Pavithran could use to substantively enhance the credibility of the ICO, and (d) enabled the Company to sell its cryptocurrency (also known as "tokens") on several well-known cryptocurrency exchanges.

34.     Pavithran used the credibility of at least one individual introduced to him by Plaintiff and his company to enhance the marketability of Boon Tech.

35.     In a pattern that would repeat itself throughout this case, Pavithran promised to pay individuals for their association with Boon Tech, but either failed to make the payments as promised or failed to make payment at all.

36.     On September 6, 2017, Plaintiff sent to Defendants a link to his "book me" page, to which the Company responded by sending Plaintiff a copy of the abstract and outline for the White Paper.

37.     On September 7, 2017, Pavithran confirmed that Plaintiff's compensation would exceed that of the other advisors to the Company. Plaintiff replied that he was spending 100% of his time on Boon Tech work and that it has become a "full time job" for him.

38.     However, when Plaintiff referred to converting their oral agreement into a written agreement or otherwise raised the question of formalizing his agreement with the Defendants, Pavithran continually put him off.  For instance, Pavithran admits that except for retaining an attorney to review the ICO "everything else is a done deal." Upon information and belief, that statement was false and intended to defraud Plaintiff.

39.     On September 10, 2017, Pavithran activated Company email accounts, including one for Plaintiff. Later, when it became clear to Plaintiff that Pavithran would renege on the agreement and Pavithran worried Plaintiff would seek redress through the Court, Pavithran cut off Plaintiff's access to this email account.

40.     Plaintiff suspects, but does not know whether and, if so, to what extent, Defendants are guilty of spoliation of evidence.

**Pavithran Maintains Complete Control Over Boon Tech**

41.     That same day, September 10, 2017, Plaintiff suggested setting up a new company to be funded by the ICO. Pavithran's reaction was immediate and emphatic: This was his company and would remain entirely under his control. Pavithran stated, "see I am not giving any of my team mates equity in the company, they will get tokens I made this software, this is my domain knowledge, and my knowledge in crypto I did all the research and decide

everything like what technology, what platform, languages like everything….” Pavithran's statement is incorrect insofar as it minimizes Plaintiff's contribution to the Company, but does reflect his control over the venture and his status as an employer.

42.     In order to maintain complete control over the company, its employees, its finances, and the ICO, Pavithran rejected founding a new company and instead used a Virginia LLC – Defendant Kelvin Boon LLC – that Pavithran set up in 2013 and in which, on information and belief, he is the sole member.

43.     Boon Tech is a fictitious name for Kelvin Boon LLC

44.     Pavithran avoided following through on his compensation commitments. For instance, on September 20, 2017, he and Plaintiff discussed retaining an individual from Merrill Lynch as an advisor. When his compensation was discussed, Pavithran directs Plaintiff to “be vague about it….”

45.     **Pavithran admitted in writing that he had promised Plaintiff $700,000 in return for Plaintiff's work.** The parties had also agreed that if Plaintiff hired additional individuals, their wages would be deducted from Plaintiff's payment. On September 28, 2017, Plaintiff proposed hiring four individuals to act as community managers for $25,000 each, or an aggregate of $100,000. Pavithran replied in writing that Plaintiff had “$600,000 left” in compensation, thereby admitting he had promised to pay Plaintiff $700,000. Of the four individuals, Pavithran used only one – Andrew Johnson of Merrill Lynch – on the ICO. However, upon information and belief, Pavithran failed to pay him and Mr. Johnson has attempted to disassociate himself from Pavithran and Boon Tech. Since Pavithran never paid any of the four individuals, no amount should be deducted from Plaintiff's wages.

46.     At no time did Plaintiff agree to accept any less than the $700,000 Defendants agreed to pay him for his work.

47.     On October 1, 2017, Pavithran admitted that Plaintiff's work for Boon Tech had been "fantastic."

48.     On October 2, 2017, Plaintiff was given the title of Director of Operations, submitted a revised curriculum vitae for inclusion on the Boon Tech web site, and continued to perform his duties under the contract.

49.     At all relevant times hereto, Pavithran has maintained that he is the CEO of and has complete control of the Company. Consistent with his overall control over the Company and its employees, Pavithran confirmed in writing that Plaintiff works for Pavithran.

50.     Between September and December 2017, Plaintiff reminded Pavithran that their oral agreement had not been converted to a written contract. Pavithran responded by telling Plaintiff not to be concerned, that he will be paid as agreed. On December 18, 2017, during a particularly strongly worded exchange of messages, Pavithran admitted Defendants owe Plaintiff for the work he had done for the Company. Two days later, Pavithran again reassured Plaintiff that Pavithran "wants him [to remain on the Boon Tech] team…."

51.     Due in large part to Plaintiff's work, the ICO was a success and as of the filing of this Complaint has raised in excess of $8 million from investors. Pavithran maintains complete control over the assets of the Company.

52.     Upon information and belief, Pavithran has converted the assets of the Company to his own use; approximately $3.5 million of the money raised by the ICO remain in Pavithran's personal "wallet;" *i.e.*, an account in which he holds Company assets and over which he has complete control.

53.     Pavithran maintained complete and exclusive control over Plaintiff's performance of the contract.

54.     Pavithran maintained complete and exclusive control over Plaintiff's compensation and is responsible for Defendants' failure to pay Plaintiff in accordance with their agreement or for the value of the work Plaintiff performed.

55.     Pavithran maintained complete and exclusive control over the hiring and firing of Company employees, including Plaintiff.

## **Plaintiff Performed the Agreement**

56.     Plaintiff's performance of his agreement with the Company is beyond question. Plaintiff performed, *inter alia*, the following work at the request of and under the supervision of Pavithran:

   a.     Lending Plaintiff's considerable credibility to the ICO.

   b.     Preparing a summary of the characteristics of successful blockchain ICOs.

   c.     Drafting the balance of the White Paper.

   d.     Introducing to Pavithran numerous individuals whose credentials, expertise, and experience could lend considerable credibility to the ICO.

   e.     Developing and implementing a marketing strategy.

   f.     Retaining an expert to security test Boon Tech's web page (upon information and belief, Pavithran also failed to pay this individual).

   g.     Introducing Boon Tech to various cryptocurrency exchanges, including Genesis, Poloniex, Cryptopia, and Kucoin.

   h.     Obtaining media exposure for Boon Tech and its ICO.

    i.     Representing Boon Tech in communications with cryptocurrency news outlets to increase Boon Tech's media exposure.

    j.     Developing a bonus structure for Boon Tech (although Pavithran never honors his commitments to pay out any bonuses).

    k.     Developing and implementing a marketing plan for Boon Tech and its ICO.

    l.     Developing and implementing a direct email campaign.

57.    Plaintiff performed all of his duties and obligations under the agreement and there is no unsatisfied condition precedent to his entitlement to payment.

58.    In October 2017, as the ICO was imminent, Plaintiff and Pavithran's relationship deteriorated. While Plaintiff was working on the serious business of retaining advisors with sufficient credibility to bring in investors, Pavithran was hiring "hot" female models to sell Boon Tech's tokens.

59.    To this point Plaintiff still had not been paid and still had no written document memorializing his contract, and Pavithran continued to lie to Plaintiff. Furthermore, Plaintiff expressed concern about Pavithran's behavior. On November 2, 2017, Plaintiff requested that his information be removed from the Boon Tech web site. That same day Pavithran admitted believing that Plaintiff will sue him.

### Pavithran Fraudulently Induced
### Plaintiff to Continue Working for Boon Tech

60.    Pavithran, however, knew he needed Plaintiff for a successful ICO. Instead of acceding to Plaintiff's request to be taken off of the "team" page, Pavithran instead told

Plaintiff he had retained attorneys to, *inter alia*, draft contracts for Plaintiff and Boon Tech's other advisors. Upon information and belief, this was a false statement intended to defraud Plaintiff.

61.     Plaintiff believed and relied on Pavithran's representations, and continued to work on the ICO. Plaintiff was instrumental in obtaining access for the Boon Tech "token" to be sold on several major exchanges, including Poloniex, Cryptopia, and Kucoin. This work was delayed by Pavithran's refusal to provide Plaintiff with the contract address of the token.

62.     Plaintiff was instrumental in having Boon Tech's ICO added to important media outlets, including www.icoalert.com, a widely subscribed and well-respected industry media web site. Pavithran refers to Plaintiff as having performed "magic."

63.     In December, Plaintiff again asked Pavithran about having his agreement reduced to writing. On December 18, 2017, Pavithran once again promised to send a written version of the oral agreement between the parties. Once again, Pavithran had no intention of providing such a document or of paying Plaintiff.

64.     Indeed, the very next day Pavithran wrote:

> …if you are not happy being in the team and if you don't [sic] want to be part of Boon, let me know. Also let me know how much I owe you for your time you spent on whitepaper proof reading, trying to get us into exchanges or any other time spent on the project. But I dont [sic] want you to call me and disrespect me like you did today.

But if you want to talk about agreement I can do that, we

will talk when you are in a good mood and we can talk like

equals. I am open to both.

Rob I cant [sic] hear you, call me when you have good

connection….

65.     The day after that, Pavithran again realized the ICO would not succeed without

Plaintiff's participation, so he stated, "I want [Plaintiff] on Boons [sic] team…."

66.     In sum, Pavithran has employed Plaintiff for $700,000 to work on the ICO.

Plaintiff performed each and every duty required by their agreement, contributing in excess of

$750,000 of time and resources to Defendants. For their part, Defendants accepted all of

Plaintiff's work and repeatedly lied to him about their intention to pay him or memorialize

their oral agreement into a written document.

## The Boon Tech ICO Raises Millions

67.     The ICO is a financial success: as noted above, upon information and belief,

Boon Tech raised in excess of $8 million.

68.     Plaintiff, whose efforts have been instrumental in the success of the ICO, has

yet to be paid for his work, however.

69.     Unable to continue avoiding the subject, Pavithran instead resorted to various

pretexts to explain his and the Company's failure to honor its obligation to Plaintiff.

70.     First, in September, Plaintiff was hit by a car while bicycling and suffered a bro-

ken leg, concussion, and various other injuries. As a result, he was unable to maintain his

normal level of work for a few days. Pavithran accused Plaintiff of non-performance. In fact,

Plaintiff continued to work while recovering from his injuries.

71.     Second, in mid-October, a business associate of Plaintiff's needed Plaintiff's assistance with a cryptocurrency matter in Alaska. Plaintiff spent approximately 72 hours  there, but continued to work on the Boon Tech ICO while assisting his colleague. Pavithran complained that Plaintiff was "unavailable for eight days…." That statement is false.

72.     Third, even though Pavithran has stated in writing that Plaintiff's work has been "fantastic" and "magic[al]," once the ICO succeeded Pavithran claimed Plaintiff failed to perform as agreed. Pavithran's statements are false, belied by the written record, and are shocking given the many hours Plaintiff devoted to the ICO.

73.     Defendants' acts, omissions, and communications require the conclusion that Pavithran never intended to pay Plaintiff for his work; instead, Pavithran and Boon Tech perpetrated an elaborate fraud on Plaintiff, inducing him to provide those services necessary to the success of the ICO without making payment as promised.

74.     Pavithran, because of his personal participation in the acts and omissions on which Plaintiff's claims are based, is individually liable for Plaintiff's damages, jointly and severally with the Company.

## COUNT ONE
## BREACH OF CONTRACT

75.     Plaintiff incorporates the preceding allegations of this Complaint as if fully set forth herein.

76.     The agreement between Plaintiff and Defendants is a valid, enforceable contract supported by good and valuable consideration.

77.     Plaintiff has fully performed each and every duty required of him by the agreement and satisfied each and every condition to receiving payment under the agreement.

78.     Defendants' acts and omissions as set forth herein constitute material breaches of the agreement.

79.     Defendants' failure to pay Plaintiff $700,000 is a material breach of the agreements.

80.     Every contract contains an implied covenant of good faith and fair dealing.

81.     Defendants breached the implied covenant by acting in bad faith to prevent Plaintiff from realizing the benefits of the contract.

82.     Defendants, through the conduct described herein, failed to exercise good faith in the performance, enforcement, or carrying out of the terms of its contract with Plaintiff.

83.     Defendant failed to permit Plaintiff to accomplish the objectives of the contract in violation of the implied covenant.

84.     Plaintiff suffered damages as a result of Defendants' breach of the implied covenant of good faith and fair dealing.

85.     As a direct, proximate, and foreseeable result of Defendants' breaches of the agreement, Plaintiff has suffered, and will continue to suffer, damages in excess of $700,000.

## COUNT TWO
## FRAUD

86.     Plaintiff incorporates the preceding allegations of this Complaint as if fully set forth herein.

87.     Defendants entered into the agreement with Plaintiff having no intention to perform as agreed, including no intention to pay Plaintiff the wages he had earned and was to earn.

88.    Defendants concealed from Plaintiff their intention not to pay Plaintiff as agreed.

89.    The omitted facts were material, and Defendants intended that Plaintiff rely on these omitted facts.

90.    Plaintiff reasonably relied on Defendants' omissions.

91.    Defendants made numerous representations of material fact to Plaintiff, including representing that a written agreement would be forthcoming, that a written agreement was being drafted, and that Plaintiff would be paid for his work.

92.    At the time Defendants made these representations, they knew or should have known them to be false.

93.    Defendants made these representations with the intent that Plaintiff rely on them and continue performing work for Defendants.

94.    Plaintiff did reasonably rely on Defendants' intentional misrepresentations of material fact.

95.    Defendants acted with malice and intended to defraud Plaintiff.

96.    As a direct, proximate, and foreseeable result of Defendants' refusal to honor their promise, Plaintiff has suffered, and will continue to suffer, damages in excess of $700,000.

**COUNT THREE**
**PROMISSORY ESTOPPEL**

97.    Plaintiff incorporates the preceding allegations of this Complaint as if fully set forth herein, except for the allegation that he and Defendants entered into an enforceable agreement.

98.     Defendants promised to pay Plaintiff $700,000 if Plaintiff performed certain tasks in connection with the Defendants' ICO, including, but not limited to, drafting the balance of the White Paper.

99.     Defendants intended that Plaintiff rely on their promise by undertaking substantial actions, including, but not limited to, drafting the balance of the White Paper.

100.    Plaintiff reasonably relied on Defendants' promise by undertaking the aforementioned tasks, including, but not limited to, drafting the balance of the White Paper.

101.    Injustice can be avoided only by estopping Defendants' denying having promised Plaintiff pay him $700,000 for the substantial work that he performed.

102.    Equity dictates that Defendants pay Plaintiff the $700,000 as promised.

103.    As a direct, proximate, and foreseeable result of Defendants' refusal to honor their promise, Plaintiff has suffered, and will continue to suffer, damages in excess of $700,000.

## COUNT FOUR
## QUANTUM MERUIT/UNJUST ENRICHMENT

104.    Plaintiff incorporates the preceding allegations of this Complaint as if fully set forth herein, except for the allegations of an agreement between the parties.

105.    Plaintiff conferred substantial benefits on Defendants.

106.    Defendants have knowledge of and accepted the benefits Plaintiff conferred on them.

107.    The circumstances are such that it would be inequitable and unjust for Defendants to retain said benefits without paying Plaintiff for them.

108.    The fair market value of Plaintiff's work of the type performed for Defendants is $500 per hour.

109.    Plaintiff worked over 1,500 hours conferring benefits on the Defendants, the fair market value of which is over $750,000.

110.    As a direct, proximate, and foreseeable result of Defendants' retention of the benefits conferred on them by Plaintiff for which they have not paid, Plaintiff has suffered, and will continue to suffer, damages in excess of $750,000.

**WHEREFORE**, Plaintiff requests this Honorable Court enter a judgment in Plaintiff's favor and against Defendants, jointly and severally, for the following:

A.      For breach of contract, $700,000;

B.      Alternatively, for promissory estoppel, $700,000;

C.      Alternatively, for quantum meruit/unjust enrichment, $750,000;

D.      An order enjoining Defendants to remove all references to Plaintiff from their public communications including, but not limited to, Boon Tech's web site;

E.      Attorneys' fees and litigation expenses;

F.      Costs;

G.      Prejudgment interest at the statutory rate; and

H.      Such other relief as the Court deems just and equitable.

March 26, 2018                                          Respectfully submitted,


                                                       _s/_____
                                                       Cameron Ippolito
                                                       Steven M. Oster (*pro hac vice* application)
                                                       COGENT LAW GROUP
                                                       1875 K Street, N.W., Fourth Floor
                                                       Washington, DC 20006

                                                       *Counsel to Plaintiff Robert Gonzalez*